KLESTADT WINTERS JURELLER
  SOUTHARD & STEVENS, LLP
Tracy L. Klestadt
John E. Jureller, Jr.
Lauren C. Kiss
200 West 41st Street, 17th Floor
New York, NY 10036
Telephone:  (212) 972-3000

**Presentment Date and Time:**
**March 4, 2016 at 12:00 P.M.**
**Objection Deadline:**
**March 1, 2016 at 5:00 P.M.**

*Attorneys for the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| CHINA MEDICAL TECHNOLOGIES, INC. | ) | Case No. 12-13736 (CGM) |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |

**MOTION OF THE FOREIGN REPRESENTATIVE FOR AN ORDER AUTHORIZING THE FOREIGN REPRESENTATIVE TO ISSUE A SUBPOENA TO COMPEL THE PRODUCTION OF DOCUMENTS AND AUTHORIZING EXAMINATION OF CHARLES SCHWAB & CO., INC. PURSUANT TO § 1521 OF THE BANKRUPTCY CODE AND RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

     Kenneth M. Krys, the foreign representative (the "**Foreign Representative**") of China Medical Technologies, Inc. ("**CMED**"), pursuant to 11 U.S.C. § 1521(a) and Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), hereby files this motion (the "**Motion**") seeking entry of an order (a) authorizing the Foreign Representative to issue a subpoena to compel Charles Schwab & Co., Inc. ("**Charles Schwab**") to produce to the Foreign Representative documents responsive to the subpoena substantially in the form attached hereto as Exhibit B (the "**Subpoena**") and (b) authorizing the Foreign Representative to conduct examinations of authorized representatives of Charles Schwab.

     In support of this Motion, the Foreign Representative respectfully states as follows:

## PRELIMINARY STATEMENT

1.      On July 27, 2012, the Foreign Representative and Cosimo Borrelli were appointed as the Joint Official Liquidators ("**Cayman Liquidators**") of CMED by the Grand Court of the Cayman Islands upon the making of a winding-up order in respect of CMED.

2.      On October 11, 2012, the Foreign Representative obtained recognition of CMED's Cayman-based insolvency proceeding ("**Cayman Proceeding**") in aid, *inter alia*, of his efforts to stay actions, suits or other proceedings against CMED, take possession and preserve the property of CMED and ascertain and conduct investigations into the affairs of CMED.  One of the principal benefits of obtaining Chapter 15 recognition has been that it has allowed the Foreign Representative to pursue an investigation into the whereabouts of CMED's assets and the undisclosed, unauthorized and fraudulent transfers of CMED's assets.  As part of that investigation, the Foreign Representative has identified and sought discovery from parties that, *inter alia*, may have information regarding the affairs of CMED including the whereabouts of the proceeds of the convertible notes ("**Notes**") issued by CMED in the United States' securities markets.  In the circumstances, the Foreign Representative requires the ability to subpoena documents and witnesses in the United States.

3.      On November 29, 2012, Mr. Borrelli and Ms. Yuen Lai Yee Liz of Borrelli Walsh Limited were appointed as provisional liquidators ("**Hong Kong Provisional Liquidators**") of CMED by order of the Hon. Harris J of the High Court of Hong Kong.

4.      On September 1, 2014, the Hon. Harris J of the High Court of Hong Kong ("**Hong Kong Court**") made an ancillary winding-up order in respect of CMED ("**Hong Kong Winding-Up Order**") pursuant to a Petition dated November 26, 2012 ("**Hong Kong Petition**").  Pursuant to an order of the Hon. Harris J dated February 5, 2015, the Hong Kong Provisional Liquidators were appointed as Joint and Several Liquidators of CMED ("**Hong Kong**

**Liquidators**").  In this motion, the Cayman Liquidators, Hong Kong Provisional Liquidators and Hong Kong Liquidators are collectively defined as the "**Liquidators**".

5.      Since their appointment, the Liquidators have carried out substantial worldwide investigations into the business, assets and affairs of CMED.  However, the Liquidators have been unable to retrieve any substantive books and records from CMED and its former management and directors have refused to provide any meaningful assistance to them. The Liquidators have only been able to locate tangible assets belonging to CMED of a nominal value.

6.      The Liquidators' ongoing investigations have also been frustrated by Mr. Samson Tsang Tak Yung ("**Mr. Tsang**"), CMED's former CFO and director, who actively opposed the Hong Kong Petition and filed misleading evidence in those proceedings in order to further his opposition.  Further details in respect of Mr. Tsang's conduct are discussed in paragraphs 25 to 33 below.

7.      The Liquidators' investigations to date indicate that CMED's former management, including Mr. Tsang and Mr. Wu Xiaodong ("**Mr. Wu**"), the former Chairman and CEO of CMED, operated a fraudulent scheme in Hong Kong for the purpose of misappropriating at least $355.5 million of CMED's cash.  This amount represents approximately 69% of the $515 million net capital raised by CMED and available to it through its fundraising activities ("**Fundraising Proceeds**").

8.      The Liquidators' ongoing investigations strongly suggest that CMED's former management misappropriated the vast majority of the Fundraising Proceeds by way of the two purported medical technology acquisitions and through a series of bank accounts in Hong Kong.

9.      The cash raised by CMED from its current creditors appears to have been misappropriated by way of two purported acquisitions of medical technology and through a

series of Hong Kong bank accounts controlled by CMED's former management.  The two acquisitions were:

(a)    CMED's purported acquisition of fluorescent in situ hybridisation technology ("**FISH Technology**") from Supreme Well Investments Limited ("**Supreme Well**") and its wholly owned subsidiary Molecular Diagnostics Technologies Limited ("**Molecular**") on or around February 6, 2007 for a purchase consideration of $176.8 million ("**FISH Acquisition**"); and

(b)    CMED's purported acquisition of surface plasmon resonance technology ("**SPR Technology**") from Supreme Well and Molecular on or around October 7, 2008 for a purchase consideration of $345 million ("**SPR Acquisition**").

10.    The vendors in these transactions, Supreme Well and Molecular, were both incorporated in the British Virgin Islands ("**BVI**").  Supreme Well and Molecular were both deregistered shortly after the FISH and SPR Acquisitions and the payment of $355.5 million by CMED to Supreme Well purportedly as consideration for the FISH and SPR Acquisitions.  The Liquidators' investigations to date indicate that the FISH and SPR Acquisitions were highly unusual.  Further details in this regard are discussed in paragraphs 36 and 37 below.

11.    The Liquidators' investigations have established that the bank accounts in the name of Supreme Well, which were used to receive the $355.5 million cash, were under the control of Mr. Tsang, who was the sole account signatory for the bank accounts.

12.    The vast majority of the $355.5 million was transferred from Supreme Well to Mr. Wu and Mr. Tsang and persons who appear to be connected with them including Mr. Chong Wing Hip ("**Mr. Chong**"), a Hong Kong resident.  The Liquidators' investigations indicate that Mr. Chong and his Hong Kong entities received at least $145 million of the $355.5 million paid

-4-

to Supreme Well and subsequently transferred $11.2 million of the $145 million to an account maintained at Charles Schwab.  Further details of the Liquidators' investigations in respect of the funds flow of $355.5 million are discussed in paragraphs 44 to 52 below.

13.     The Liquidators have not yet identified the ultimate recipients of CMED's funds but there are strong *prima facie* grounds for suspecting that Supreme Well and Molecular were not arm's length parties but were mere vehicles controlled by CMED's former management for the purposes of operating a fraudulent scheme to misappropriate the Fundraising Proceeds.

14.     Through this Motion, the Foreign Representative seeks to compel the production of documents from Charles Schwab and to take an examination of authorized representatives of Charles Schwab.  Upon information and belief, Charles Schwab is in possession of material documents and information concerning CMED's funds and, as set forth more fully below herein, concerning allegedly fraudulent transactions entered into by CMED and its former management. The Foreign Representative believes that information in the control of Charles Schwab is essential to permit the Foreign Representative to advance the Liquidators' tracing of the $355.5 million Fundraising Proceeds.   Given the nexus between the documents and information possessed by Charles Schwab and the investigation being undertaken by the Foreign Representative, the requested discovery falls squarely within the scope of section 1521(a)(4) of the Bankruptcy Code, which provides for the discovery of "the debtor's assets, affairs, rights, obligations, or liabilities . . . ." 11 U.S.C. § 1521(a)(4).

## PROCEDURAL HISTORY

15.     On August 31, 2012, the Foreign Representative filed a petition in this Court for recognition of the Cayman Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

16.    On October 10, 2012, the Court held a hearing on the recognition of the Foreign Representative's Chapter 15 petition and, at the hearing, indicated that the Court would grant recognition as a foreign main proceeding.  On October 11, 2012, the Court entered an order recognizing the Cayman Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code.  See Docket No. 16.

17.    The Court has granted each of the prior requests by the Foreign Representative for authority to issue subpoenas to compel certain parties to produce documents to the Foreign Representative and to conduct examinations of authorized representatives.[1]

## JURISDICTION AND VENUE

18.    The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates underlying the relief requested in this Motion are sections 105(a) and 1521(a) of the Bankruptcy Code and Bankruptcy Rule 2004.

---

[1] AlixPartners LLP, Bellagio LLC, Bi, Ming Chen, CIBC World Markets Corp., Credit Suisse Securities (USA) LLC, Lingyu Lee, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Merrill Lynch & Co., Paul, Weiss, Rifkind, Wharton & Garrison LLP, PricewaterhouseCoopers LLP, Wynn Resorts Limited, K&L Gates LLP and Shearman & Sterling LLP.  See Docket No. 58. Junyun Bi.  See Docket No. 89.  Microsoft Corporation and its subsidiaries, Jack Henry & Associates Inc. and its subsidiaries, and Wynn Las Vegas LLC.  See Docket Nos. 97, 98.  J.P. Morgan Chase & Co.  See Docket No. 106.  Clayton, Howarth & Cannon, P.C.  See Docket No. 143.  The Bank of East Asia and the Bank of China.  See Docket No. 152.  Las Vegas Sands, Corp., MGM Grand Hotel & Casino and MGM Grand Hotel LLC, Resorts World Casino New York City, Trump Entertainment Resorts, Inc., and Golden Nugget Atlantic City, LLC.  See Docket No. 154.  Pechanga Resort & Casino and Pechanga Development Corporation.  See Docket No. 155.  Wells Fargo Bank, N.A. and Northern Trust International Banking Corporation.  See Docket No. 162.  Dr. Chen Zhong.  See Docket No. 163.  Associated Regional and University Pathologists Laboratories.  See Docket No. 173.

## RELEVANT FACTUAL BACKGROUND

*Background and Winding-up of CMED*

19.     CMED was incorporated under the laws of the Cayman Islands on July 6, 2004. On August 10, 2005, CMED was listed on NASDAQ.  CMED's shares were traded on NASDAQ until it was delisted on February 28, 2012.

20.     CMED was purportedly carrying on a business of developing, manufacturing and marketing advanced surgical and medical equipment in Mainland China, using in-vitro diagnostic products such as FISH Technology and SPR Technology.

21.     Between 2005 and 2010, CMED raised net debt and equity capital of $631 million, including by issuing various senior unsecured convertible notes.  CMED had $515 million of funds available to it following the repayment of amounts due to Deutsche Bank Trust and Bank of America totaling $116 million.

22.     On December 15, 2011, CMED failed to make an interest payment of $4,687,500 on its 6.25% senior unsecured convertible notes.  Two months later, on February 15, 2012, CMED failed to make an interest payment of $4,930,000 on its 4% senior unsecured convertible notes.  These two interest payment defaults formed the basis of the petition to the Grand Court of the Cayman Islands on June 15, 2012 for the winding-up of the CMED and the appointment of the Foreign Representative and his fellow Liquidator on July 27, 2012.

*Hong Kong Petition*

23.     On November 26, 2012, CMED, acting at the direction of the Cayman Liquidators, filed the Hong Kong Petition. On November 29, 2012, Ms. Yuen and Mr. Borrelli were appointed as the Hong Kong Provisional Liquidators by order of the Hon. Harris J.

24.     Since their appointment, the Liquidators conducted an international investigation in respect of the affairs of CMED including investigating what had happened to the $631 million of Fundraising Proceeds.

25.     The Hong Kong Petition was vigorously opposed by Mr. Tsang, notwithstanding that he is not one of CMED's creditors and only claims to be a contributory holding less than 1% of CMED's shares.  The Hong Kong Petition was heard on six (6) hearing days over a period of seven (7) months, with hearings in February, March, June and August 2013.  Mr. Tsang misled the Hong Kong Court by portraying CMED as having little connection with Hong Kong and by asserting that the FISH and SPR Acquisitions were legitimate transactions and that Supreme Well - the purported vendor of the FISH and SPR Technology - was an independent third party.

26.     The Hon. Harris J reserved his judgment following the conclusion of the hearing of the Hong Kong Petition on August 27, 2013.  By letter dated September 5, 2013, the Hon. Harris J stated that he intended to dismiss the Hong Kong Petition and set aside the appointment of the Hong Kong Provisional Liquidators.

27.     Notwithstanding that letter, the Liquidators continued their investigations. Pursuant to a subpoena issued by this Court, the Liquidators obtained banking documents for Supreme Well's bank accounts maintained at The Bank of East Asia Limited ("**BEAHK**") in Hong Kong which showed that Mr. Tsang was the sole authorized signatory for Supreme Well's account with BEAHK.

28.     In view of this revelation, the Liquidators filed an application on January 30, 2014, *inter alia*, to adduce fresh evidence and re-open the hearing of the Hong Kong Petition ("**Application to Re-Open**").

-8-

29.     From July 21, 2014 through July 23, 2014, the Application to Re-Open was heard before the Hon. Harris J.   On August 28, 2014, the Hon. Harris J handed down his decision granting the Application to Re-Open.  A copy of the Hong Kong Court's decision dated August 28, 2014 (the "**Hong Kong Decision**") is annexed as <u>Exhibit C</u>.   On September 1, 2014, the Hon. Harris J made the Hong Kong Winding-Up order.

30.     In the Decision of August 28, 2014, the Hon. Harris J held that:

(a)     Mr. Tsang's evidence could not be relied upon and stated that he was intent on *"avoiding his conduct being investigated"*; and

(b)     <u>*"[t]he way in which the [bank] accounts were opened and operated is also*</u> <u>*suspicious*</u>*....What is clear is that there is good reason to be very suspicious about the genuineness of the sale of FISH and SPR <u>and that the way in which the proceeds of sale were dealt with subsequently require investigation</u>"*.

31.     On September 15, 2014, the Hong Kong Court ordered that Mr. Tsang be examined in respect of CMED's business and affairs.  The examination was fixed for three (3) days in February 2015 and two (2) days in April 2015.

32.     Notwithstanding the order of September 15, 2014 for the examination of Mr. Tsang, Mr. Tsang informed the Hong Kong Court and the Liquidators in mid-January 2015 that he would not attend his examination from February 11, 2015 through February 13, 2015 in person.

33.     On February 11, 2015, the Hon. Harris J made an order for the issuance of an arrest warrant in respect of Mr. Tsang in light of his failure to attend the examination without good cause.  The arrest warrant was served on Mr. Tsang's solicitors on March 13, 2015. However, Mr. Tsang continued to choose not to attend his examination on April 13, 2015 and

April 14, 2105, and to this day continues to avoid the arrest warrant issued on February 11, 2015 and evade justice.

*The Liquidators' Investigations*

34.     Since their appointment in the Cayman Islands on July 27, 2012, the Liquidators have carried out substantial worldwide investigations into the business, assets and affairs of CMED.  However, the Liquidators' investigations have been hampered by:

(a)     the very limited books and records of CMED available to them;

(b)     a lack of cooperation from the directors and officers of CMED and its subsidiaries, save for some limited assistance provided by two (2) former independent directors of CMED;

(c)     Mr. Tsang's opposition to the Hong Kong Petition and the misleading evidence led by him in the Hong Kong Petition; and

(d)     a lack of any meaningful assistance from third parties, including CMED's former professional service providers, which have provided only a limited number of documents to the Liquidators.

*FISH and SPR Acquisitions*

35.     As purported consideration for the FISH and SPR Acquisitions, Supreme Well received at least $355.5 million from CMED between 2006 and 2009.  The $355.5 million was deposited into bank accounts in Supreme Well's name at the Bank of China (Hong Kong) Ltd ("**BOCHK**") and BEAHK and represented the majority of the CMED's cash at that time.

36.     The FISH and SPR Acquisitions have the following unusual features:

(a)     the persons named as directors of Supreme Well and Molecular in documentation for the FISH and SPR Acquisitions each deny on oath that they were a director or beneficial shareholder of Supreme Well or Molecular.   Moreover, they deny any

-10-

knowledge or involvement with Supreme Well and state on oath that their signatures have been forged on the relevant documents;

(b)      CMED engaged two valuation companies to undertake a valuation of the FISH Acquisition.  However, the valuation companies were only engaged after CMED acquired the FISH Technology in February 2007.  The difference in the valuation opinions of the two companies was approximately $170 million, despite both companies relying upon similar information provided to them by CMED;

(c)      the method and manner of CMED's payments to Supreme Well for the FISH and SPR Acquisitions by way of 55 cashier orders was highly unusual and cast doubt upon the true nature and purpose of the transfers;

(d)      the Minutes of a Board Meeting dated August 24, 2007 indicate that Mr. Wu, purportedly on behalf of CMED, signed a letter of intent and procured CMED to pay $22 million to Supreme Well by way of four (4) cashier orders of $5.5 million each in exchange for a right of first refusal in respect of the SPR Acquisition.  This payment was made without the knowledge or prior consent of CMED's Board of Directors;

(e)      the Liquidators have been unable to identify any valuable technology that was received by CMED pursuant to the FISH and SPR Acquisitions. Further, the Liquidators' enquiries with three FISH Technology experts in Hong Kong, New York and the Netherlands indicate that the FISH Technology had been in existence for almost 30 years and it is unlikely that the technology could have been patented or of any significant value at the time it was acquired by CMED; and

(f)      the FISH and SPR Acquisitions were the subject of an anonymous letter dated 4 February 2009 ("**Anonymous Letter**"), The Anonymous letter was received by CMED's

former auditor, KPMG Hong Kong, on February 10, 2009. A copy of the Anonymous Letter is annexed as <u>Exhibit D</u>. The Anonymous letter alleged, *inter alia*, that Supreme Well and Molecular had no apparent business operations and were owned by certain parties in Mainland China who were related to CMED's management. The Anonymous Letter also alleged that the FISH and SPR Acquisitions were "*possible illegal and fraudulent activities*"; and that there were grounds to believe that CMED's management used these acquisitions to extract money in the form of purchase price consideration; and

(g)    KPMG Hong Kong apparently investigated the allegations contained in the Anonymous Letter and prepared (at least) an internal memorandum dated May 5, 2009 in respect of those investigations. KPMG subsequently resigned as auditor of CMED and was replaced by PricewaterhouseCoopers Zhong Tian CPAs Limited Company on August 7, 2009.

37.    Further, it appears that Supreme Well had no business operations other than to act as a recipient of CMED's funds. Supreme Well was registered in the BVI on March 28, 2006. Supreme Well was struck off the Register of Companies on November 1, 2012, which was only a short time after Supreme Well received $355.5 million from CMED purportedly as payment for the FISH and SPR Acquisitions.

38.    In the course of making the Hong Kong Winding-Up Order, the Hong Kong Court stated as follows in its Decision dated August 28, 2014:

> *The transaction between the Company and Supreme Well and Molecular was, according to public announcements made by the Company at the time, an arm's length transaction. However, the new documents obtained by the liquidators show that the 2 accounts into which US$355,000,000 was deposited with Bank of China Hong Kong and the Bank of East Asia respectively, had as their sole authorised signatory Mr. Tsang.*

. . .

-12-

*What is clear is that <u>there is good reason to be very suspicious about the</u> <u>genuineness of the sale of FISH and SPR</u> and that the way in which the proceeds of sale were dealt with subsequently require investigation.*

*. . .*

*<u>There is now reason to think that a very large part of the Company's assets has</u> <u>been misappropriated through a scheme operated in Hong Kong</u> involving various persons who themselves are normally resident here [in Hong Kong] . . . and using bank accounts in Hong Kong which were operated personally by Mr. Tsang in Hong Kong.*

*. . .*

*In the present case the evidence that has come to light since July of last year makes it clear there are strong prima facie grounds for suspecting that a very significant part of the Company's assets have been misappropriated in Hong Kong using a number of Hong Kong bank accounts operated by persons in Hong Kong. It is now clear that there is a very strong connection between Hong Kong and the affairs of the Company and that the events that took place in Hong Kong are central to the liquidation both in the sense that they need to be investigated in order that liquidators can determine whether claims are available against third parties and also in order to determine whether offences have occurred.*

Hong Kong Decision, ¶¶ 10, 13, 14, 16 (emphasis added).

39.    In April 2009, CMED's audit committee ("**Audit Committee**") engaged Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul Weiss**") and AlixPartners LLP ("**AlixPartners**") to carry out a so-called independent internal investigation into the allegations in the Anonymous Letter ("**Independent Investigation**"). The Independent Investigation purportedly cleared CMED of any wrong-doing.

40.    The Liquidators are strongly of the view that further investigation of the FISH and SPR Acquisitions and the allegations in the Anonymous Letter is necessary. In the circumstances, the Liquidators issued subpoenas in the United States against Paul Weiss and

AlixPartners in February 2013 to compel them to produce the documents relating to the Independent Investigation.

41.     Paul Weiss and AlixPartners opposed the production of a substantial portion of the documents sought in the subpoenas on the basis of the attorney-client privilege and work-product privilege, which they claimed belonged to the Audit Committee.  On December 1, 2014, this Court handed down a decision in favor of Paul Weiss and AlixPartners.

42.     The Liquidators successfully appealed the decision dated December 1, 2014 to the United States District Court for the Southern District of New York (the "**District Court**").  The District Court handed down its decision on September 30, 2015 and in November 2015, Paul Weiss and AlixPartners produced the documents originally withheld by them to the Liquidators.

43.     On the basis of the Liquidators' discoveries, the allegations made in the Anonymous Letter regarding the FISH and SPR Acquisitions appear, in fact, to be accurate. There are now very good reasons to doubt the conclusions reached by Paul Weiss and AlixPartners of no wrongdoing by the CMED management in respect of the allegations set out in the Anonymous Letter.

*Funds Flow*

44.     A funds flow diagram showing the flow of $355.5 million from CMED to Supreme Well and from Supreme Well to the further recipients is annexed at <u>Exhibit E</u>.  The funds flow diagram was prepared by the Liquidators on the basis of banking documentation provided to them by BOCHK and BEAHK.

-14-

45.    A simplified version of the funds flow diagram is set out below:



46.    The banking documentation obtained by the Liquidators establishes that:

(a)    Mr. Tsang was the sole authorized account signatory for Supreme Well's bank accounts with BOCHK and BEAHK into which Supreme Well deposited the 55 cashier orders totaling $355.5 million that it received from CMED;

(b)    Mr. Tsang was on both sides of the FISH and SPR Acquisitions – i.e. Supreme Well was not an arm's length vendor to CMED in respect of the FISH and SPR Acquisitions;

(c)    East Hope International Limited ("**East Hope**"), Cheer Link International Limited ("**Cheer Link**") and Innovative Technology Limited ("**Innovative**") collectively received $294.5 million or approximately 83% of the $355.5 million paid by CMED to Supreme Well.    The $294.5 million was transferred to bank accounts in the names of these

companies, in respect of which Mr. Wu and/or Mr. Tsang were also the authorized signatories; and

(d)    the bank accounts of Supreme Well, East Hope and Cheer Link appear to have been opened solely for the purpose of receiving and disbursing the $355.5 million paid by CMED.  These bank accounts were all closed in or around December 2011, when CMED defaulted on the payment of the Notes.

47.    As set out in the Funds Flow diagram, Mr. Chong and his entities including Kam Hing Trading Co., ("**Kam Hing**") and Innovative Technology Investments Limited ("**Innovative**") received a total of $59.4 million from Supreme Well between July 31, 2007 and January 19, 2009.

48.    The Liquidators' ongoing investigations further indicate that East Hope transferred a total of $85.9 million to Mr. Chong ($6.7 million), Innovative ($49.4 million) and Kam Hing ($29.8 million) upon its receipts of the $231.5 million from Supreme Well. Accordingly, Mr. Chong and his entities received a total of $145.3 million out of $355.5 million paid to Supreme Well from CMED.

49.    Subsequent to the receipts of the $145.3 million, Mr. Chong transferred at least $11.2 million of the $145.3 million to an account no. 42181192 ("**Schwab Account**") maintained at Charles Schwab between October 22, 2008 and January 19, 2009 (collectively, the "**Schwab Payments**").

50.    The Liquidators' investigations regarding the use and whereabouts of the $355.5 million are ongoing.

51.    The Hong Kong Court discussed the funds flow above at paragraph 12 of the Hong Kong Decision dated  August 28, 2014 as follows:

> *What can be readily seen [in the diagram] is that by a series of transactions involving Hong Kong bank accounts opened in the name of companies incorporated in the British Virgin Islands, which were purportedly owned by persons who had some connection with the Company, all of which, other than Kam Hing Trading Co, had Mr. Tsang as one of the signatories, US$294,500,000 was transferred ultimately into accounts controlled by Mr. Wu or Mr. Tsang. . . . This is inconsistent with the Company's assertion that the sale of FISH and SPR by Supreme Well and Molecular to the Company was an arm's length transaction.*

Hong Kong Decision, ¶ 12 (emphasis added).

52.     The High Court of Hong Kong's observations are consistent with the allegations made in the Anonymous Letter.

*Necessity for a Comprehensive Investigation*

53.     The Foreign Representative believes that the information in respect of the Schwab Account that is in the possession of Charles Schwab will assist the Liquidators in advancing their funds tracing in order to identify the ultimate recipients of the $355.5 million and thus, establish whether there are any assets available to the creditors of CMED.  The Foreign Representative therefore believes that the exercise of his discovery rights under the Bankruptcy Code and Bankruptcy Rules is necessary to fully investigate the facts and circumstances concerning, *inter alia*, the misappropriation and fraudulent transfer of CMED's cash.  The Foreign Representative requires the discovery requested by this Motion to aid his effort to recover CMED assets for its creditors.

**RELIEF REQUESTED**

54.     By this Motion, the Foreign Representative seeks an order: (i) authorizing the Foreign Representative to issue a Subpoena in the form attached hereto as Exhibit B compelling Charles Schwab to produce documents responsive to the Subpoena, and (ii) authorizing the Foreign Representative to take the deposition of authorized representatives of Charles Schwab.

55.     The Foreign Representative requires such information to properly discharge his

duty to his constituency under Cayman law.  On behalf of CMED's stakeholders, the Foreign

Representative is entitled to seek and obtain discovery regarding issuance of the Notes, the

whereabouts of the proceeds of the Notes, and the misappropriation or fraudulent transfer of

CMED assets.[2]

## BASIS FOR REQUESTED RELIEF

## I.      The Requested Discovery Is Proper Under Bankruptcy Code Section 1521(a)(4) and Bankruptcy Rule 2004

56.     Discovery in a chapter 15 proceeding is governed by section 1521(a)(4) of the

Bankruptcy Code, which provides, in pertinent part, as follows:

> (a) Upon recognition of a foreign proceeding, whether main or non-main, where
> necessary to effectuate the purpose of this chapter and to protect the assets of the
> debtor or the interests of the creditors, the court may, at the request of the foreign
> representative, grant any appropriate relief, including—
>
> (4) providing for the examination of witnesses, the taking of evidence or the
> delivery of information concerning the debtor's assets, affairs, rights, obligations
> or liabilities.

57.     Courts have held that chapter 15 provides for the production of documents and

examination of witnesses in recognized foreign proceedings.  See In re Pro-Fit Holdings Ltd.,

391 B.R. 850, 860 (Bankr. C.D. Cal. 2008) (relief under section 1521(a)(4) "includes the

examination of witnesses pursuant to Rule 2004 and the delivery of information concerning the

debtor's assets, affairs, rights, obligations or liabilities[.]"); In re SPhinX Ltd., 351 B.R. 103, 113

(Bankr. S.D.N.Y. 2006) (recognizing various forms of relief available to a foreign representative

in chapter 15 proceedings, including "the examination of witnesses and the delivery of

---

[2] The Foreign Representative continues to reserve his right to request and/or conduct any other discovery pursuant to
section 1521(a)(4), Bankruptcy Rule 2004 or other applicable law, including serving additional document requests
on, or taking deposition testimony from, any person or entity, including, without limitation, Charles Schwab.

information"); see also 8 Collier on Bankruptcy ¶ 1521.02 (16th ed. rev. 2012) ("Subsection 1521(a)(4) enables discovery.").

58.    Bankruptcy Rule 2004 provides an additional ground for seeking discovery in a chapter 15 proceeding. See In re Millennium Global Emerging Credit Master Fund Ltd., No. 11-13171 (ALG) (Bankr. S.D.N.Y. Dec. 2, 2011) [Docket No. 71] (in chapter 15 case, court authorized and directed discovery in the form of document requests and depositions pursuant to section 1521(c) and Bankruptcy Rule 2004); In re Fairfield Sentry Ltd., No. 10-13164 (BRL), Order Authorizing the Issuance of Subpoenas for Production of Documents and Examination of Witnesses Pursuant to § 1521 of the Bankruptcy Code and Rule 2004 of the Federal Rules of Bankruptcy Procedures (Bankr. S.D.N.Y. Apr. 5, 2011) [Docket No. 401].

59.    Rule 2004(b) provides, in relevant part, as follows:

*(a)  Examination on Motion.* On motion of any party in interest, the court may order the examination of any entity.

*(b)  Scope of Examination.* The examination of an entity under this rule or of the debtor under § 343 of the Code may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge . . .

*(c)  Compelling Attendance and Production of Documentary Evidence.* The attendance of an entity for examination and the production of documentary evidence may be compelled in the manner provided in Rule 9016 for the attendance of witnesses at a hearing or trial.

60.    As the basic discovery device used in bankruptcy cases, "[t]he purpose of a Rule 2004 examination is to allow the court to gain a clear picture of the condition and whereabouts of the bankrupt's estate." In re Johns-Manville Corp., 42 B.R. 362, 364 (S.D.N.Y. 1984); see also In re Drexel Burnham Lambert Group, Inc., 123 B.R. 702, 708-09 (Bankr. S.D.N.Y. 1991) (explaining that the intent of bankruptcy law in general—and Bankruptcy Rule 2004 specifically—is for the court to gain an accurate and detailed insight into the affairs of the

debtor's estate); In re Ionosphere Clubs, Inc., 156 B.R. 414, 432 (S.D.N.Y. 1993), aff'd, 17 F.3d

600 (2d Cir. 1994) ("Because the purpose of the Rule 2004 examination is to aid in the discovery

of assets, any third party who can be shown to have a relationship with the debtor can be made

subject to a Rule 2004 investigation.").

61.     While the scope of a Rule 2004 investigation is ordinarily set forth in Bankruptcy

Rule 2004(b), section 1521(a)(4) sets forth the scope of the investigation in the context of a

chapter 15 case.  See In re Glitnir banki hf., No. 08-14757 (SMB), 2011 WL 3652764, at *6

(Bankr. S.D.N.Y. Aug. 19, 2011).  Thus, by its terms, the Bankruptcy Code permits the Foreign

Representative to take broad discovery concerning the affairs of CMED.

## II.    The Requested Discovery Is Appropriate Under the Circumstances

62.     The discovery sought by the Foreign Representative falls squarely within the

scope of section 1521(a)(4) of the Bankruptcy Code and Bankruptcy Rule 2004.  Specifically,

the Foreign Representative seeks the Court's authority to issue a Subpoena to Charles Schwab

and, if deemed appropriate by the Foreign Representative, following a review of the documents

produced, to take the deposition of authorized representatives of Charles Schwab   As is set forth

below, such discovery is appropriate in the case of Charles Schwab.

63.     The documents requested in the Subpoena, including, but not limited to, the

balance (if any) currently standing in the Schwab Account; the name of the legal and beneficial

owner of the Schwab Account; the account opening form and operating mandates for the Schwab

Account; the account statements for the Schwab Account; the transaction documents in support

of all transactions in the Schwab Account; and in the event that the Schwab Account was closed,

the account closing documents, will assist the Foreign Representative in his investigation.

64.     Based upon the information available to the Foreign Representative, Charles Schwab may have documents and information concerning the location and amount of assets or funds of CMED which were misappropriated.

65.     The Foreign Representative submits that, under the extraordinary circumstances of this case, broad discovery is unquestionably necessary to aid the Foreign Representative in determining the whereabouts of the missing Fund Raising Proceeds and the nature and extent of the fraud perpetrated by CMED's former management. The information which may be in Charles Schwab's possession could significantly enhance the Foreign Representative's investigation.

66.     The Foreign Representative further submits that Charles Schwab is an appropriate recipient of such discovery requests.

## NOTICE

67.     The Foreign Representative has provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) Charles Schwab; and (c) all parties that have filed a notice of appearance in this chapter 15 case.   The Foreign Representative respectfully submits that no other or further notice need be given.

## NO PRIOR REQUEST FOR RELIEF

68.     No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Foreign Representative respectfully requests that the Court

enter an order in the form attached hereto as Exhibit A, and grant such other and further relief as

this Court deems appropriate.

New York, New York                          Respectfully submitted,
Dated:  February 12, 2016

KLESTADT WINTERS JURELLER
  SOUTHARD & STEVENS, LLP

By: */s/John E. Jureller, Jr.*
Tracy L. Klestadt
John E. Jureller, Jr.
Lauren C. Kiss
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000

*Attorneys for the Foreign Representative*