KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP
Tracy L. Klestadt
John E. Jureller, Jr.
Lauren C. Kiss
200 West 41st Street, 17th Floor
New York, NY 10036
(212) 972-3000

*Attorneys for the Foreign Representative
and proposed successor Foreign Representive*

**Hearing Date: July 10, 2018 at 10:00 a.m.**
**Objection Deadline: July 3, 2018 at 4:00 p.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re                                            :    Chapter 15
                                                 :
CHINA MEDICAL TECHNOLOGIES, INC.  :
                                                 :    Case No. 12-13736 (MKV)
    Debtor in a Foreign Proceeding.       :
                                                 :
                                                 :
------------------------------------------------------------X

## APPLICATION FOR SUBSTITUTION
## OF SUCCESSOR FOREIGN REPRESENTATIVE

Samantha Wood, one of the joint official liquidators appointed in the Cayman Proceedings (defined later herein) and the proposed successor foreign representative (the "**Successor Foreign Representative**") of China Medical Technologies, Inc. ("**CMED**" or the "**Debtor**"), through her counsel, submits this application (the "**Application**") pursuant to 11 U.S.C. §§ 1512, 1518(1) and 1521(a)(7), for an order, substantially in the form attached hereto as **Exhibit A**, substituting the Successor Foreign Repsepresentative in place and instead of the current foreign representative, Margot MacInnis (the "**Foreign Representative**"), with all powers and authority previously granted to the Foreign Representative under the Recognition Order (defined below herein), and in support of this Application, states as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §1410. This matter is a core matter under 28 U.S.C. § 157(b)(2)(P).

2. The statutory predicates for the relief sought herein are, *inter alia*, 11 U.S.C. §§ 1512, 1518(1) and 1521(a)(7).

## BACKGROUND[1]

**Procedural Background:**

3. On August 31, 2012, Kenneth Krys, as the then-appointed Foreign Representative of CMED, filed a petition (the "**Petition Date**") in this Court for recognition of the Cayman Proceeding as a foreign main proceeding under chapter 15 ("**Chapter 15**") of title 11 of the United States Code (the "**Bankruptcy Code**")

4. On October 10, 2012, the Court held a hearing on the recognition of the Foreign Representative's Chapter 15 petition and, at the hearing, indicated that the Court would grant recognition as a foreign main proceeding. On October 11, 2012, the Court entered an order recognizing the Cayman Proceeding as a foreign main proceeding under Chapter 15 of the Bankruptcy Code (the "Recognition Order"). See Docket No. 16.

5. By Order dated June 1, 2017, the Court appointed Margot MacInnis, in place of Kenneth Krys, as the Foreign Representative of CMED. See Docket No. 220.

---

[1] The facts and circumstances of this matter are also set forth in the Declaration of Samantha Wood in Support of Application for Substitution of Successor Foreign Representative, as well as the Declaration of Margot MacInnis dated May 5, 2017. See Docket No. 217-3.

**Factual Background:**

6. CMED was incorporated under the laws of the Cayman Islands on July 6, 2004. On August 10, 2005, CMED was listed on NASDAQ. The trading of CMED's shares was suspended on February 28, 2012 and it was delisted on March 14, 2012.

7. CMED is a holding company that, prior to February 2012, had effective control, through a series of wholly-owned direct and indirect subsidiaries, of three (3) operating companies in the People's Republic of China (the "**PRC**") that were purportedly carrying on a business of developing, manufacturing and marketing advanced surgical and medical equipment, including using in-vitro diagnositic products such as FISH Technology and SPR Technology (the "**PRC Subsidiaries**").

8. Between 2005 and 2010, CMED raised net debt and equity capital of $631 million, including by issuing various senior unsecured convertible notes (collectively, the "**Notes**"). CMED had $515 million of funds available to it following the repayment of amounts due to Deutsche Bank Trust and Bank of America totaling $116 million.

9. On December 15, 2011, CMED failed to make an interest payment of $4,687,500 on its 6.25% senior unsecured convertible notes. Two months later, on February 15, 2012, CMED failed to make an interest payment of $4,930,000 on its 4% senior unsecured convertible notes.

10. These two interest payment defaults formed the basis of the petition to the Grand Court of the Cayman Islands (the "**Cayman Court**") on June 15, 2012 for the winding-up of the CMED and the appointment of Kenneth Krys and Cosimo Borrelli as joint official liquidators ("**Cayman Liquidators**") on July 27, 2012 (the "**Cayman Proceeding**").

11. On September 1, 2014, the Hon. Harris J of the High Court of Hong Kong ("**Hong Kong Court**") made an ancillary winding-up order in respect of CMED pursuant to a Petition

dated November 26, 2012 ("**Hong Kong Petition**"). Pursuant to an order of the Hon. Harris J dated February 5, 2015, Mr. Borrelli and Ms. Yuen Lai Yee Liz of Borrelli Walsh Limited were appointed as Joint and Several Liquidators of CMED ("**Hong Kong Liquidators**"). In this Application, the Cayman Liquidators and Hong Kong Liquidators are collectively defined as the "**Liquidators**".

**The Liquidators' Investigations:**

12. Since their appointment, the Liquidators have carried out substantial worldwide investigations into the business, assets and affairs of CMED. However, the Liquidators have been unable to retrieve any substantive books and records directly from CMED, and its former management and executive directors have refused to provide any meaningful assistance to them. To date, the Liquidators have only been able to locate tangible assets belonging to CMED of a nominal value.

13. The Liquidators' ongoing investigations have also been frustrated by Mr. Samson Tsang Tak Yung ("**Mr. Tsang**"), CMED's former CFO and director, who actively opposed the Hong Kong Petition and filed misleading evidence in those proceedings in order to further his opposition.

14. With the assistance of various Courts of different jurisdictions (including the United States, Cayman Islands, Hong Kong and Singapore), the Liquidators have recovered substantial documents from CMED's former service providers based in the US, Hong Kong and Singapore, which materially assist with their investigations.

15. The Liquidators' investigations to date indicate that CMED's former management, including Mr. Tsang and Mr. Wu Xiaodong ("**Mr. Wu**"), the former Chairman and CEO of

CMED, operated a fraudulent scheme for the purpose of misappropriating at least $521.8 million of CMED's cash by way of the following two purported acquisitions of medical technology:

(a) CMED's purported acquisition of fluorescent in situ hybridisation technology ("**FISH Technology**") from Supreme Well Investments Limited ("**Supreme Well**") and its wholly owned subsidiary Molecular Diagnostics Technologies Limited ("**Molecular**") on or around February 6, 2007 for a purchase consideration of $176.8 million ("**FISH Acquisition**"); and

(b) CMED's purported acquisition of surface plasmon resonance technology ("**SPR Technology**") from Supreme Well and Molecular on or around October 7, 2008 for a purchase consideration of $345 million ("**SPR Acquisition**").

16. The FISH and SPR Acquisitions were represented to the market as arm's-length transactions.

17. Of the $521.8 million, $355.5 million was deposited into bank accounts in Supreme Well's name at The Bank of China (Hong Kong) Ltd ("**BOCHK**") and The Bank of East Asia Hong Kong ("**BEAHK**"). The Liquidators' investigations indicate that:

(a) Mr. Tsang was the sole account signatory of Supreme Well's accounts at BOCHK and BEAHK. This was not disclosed to the Board of CMED or the market, and indicates that the FISH and SPR Acquisitions were, in fact, undisclosed related party transactions;

(b) Mr. Tsang was on both sides of the FISH and SPR Acquisitions. Thus Supreme Well was not an arm's length vendor to the Company in respect of the FISH and SPR Acquisitions;

(c) the Liquidators' investigations have revealed that at least US$294.5 million of the US$355.5 million was transferred out of Supreme Well's bank accounts, at Mr. Tsang's instruction, into other bank accounts controlled by Mr. Tsang and/or Mr. Wu;

(d) East Hope International Limited ("**East Hope**"), Cheer Link International Limited ("**Cheer Link**") and Innovative Technology Limited ("**Innovative**") collectively received $294.5 million or approximately 83% of the $355.5 million paid by CMED to Supreme Well. The $294.5 million was transferred to bank accounts in the names of these companies, in respect of which Mr. Wu and/or Mr. Tsang were also the authorized signatories; and

(e) the bank accounts of Supreme Well, East Hope and Cheer Link appear to have been opened solely for the purpose of receiving and disbursing the $355.5 million paid by CMED. These bank accounts were all closed in or around the time that CMED defaulted on the payment of the Notes.

18. The Liquidators' investigations of the remaining $166.3 million are ongoing. It appears that CMED and / or its PRC subsidiaries had paid the $166.3 million to Supreme Well (or its associated entities) in the PRC.

19. The FISH Acquisition and SPR Acquisition were the subject of an anonymous letter dated 4 February 2009 ("**Anonymous Letter**"). The Anonymous letter was received by CMED's former auditor, KPMG Hong Kong, on February 10, 2009. The Anonymous letter alleged, *inter alia*, that Supreme Well and Molecular had no apparent business operations and were owned by certain parties in Mainland China who were related to CMED's management. The Anonymous Letter also alleged that the FISH Acquisition and SPR Acquisition were "*possible illegal and fraudulent activities*", and that there were grounds to believe that CMED's

management used these acquisitions to extract money in the form of purchase price consideration.

20. The evidence available to the Liquidators indicates that Supreme Well had, in fact, no business operations, but only acted as a recipient of CMED's funds. Supreme Well was registered in the British Virgin Islands on March 28, 2006, only 9 months prior to receiving its first payment from CMED. Supreme Well was struck off the Register of Companies on November 1, 2012 for non-payment of annual fees.

21. In response to the Anonymous Letter, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul Weiss**") were retained by CMED's audit committee between April and July 2009 to investigate the allegations in the Anonymous Letter ("**Independent Investigation**"). CMED had paid approximately $4 million in fees for the Independent Investigation.

22. After Paul Weiss completed the Independent Investigation, they had reported the results to CMED's audit committee at a video conference in July 2009. During the video conference, Paul Weiss gave advice to the effect that there was no merit in the allegations of misconduct in the Anonymous Letter. However, on the basis of the Liquidators' investigation, many, if not all, of the allegations in the Anonymous Letter were, in fact, accurate.

23. In the course of making the Hong Kong Winding-Up Order, the Hong Kong Court stated as follows in the Hong Kong Decision dated August 28, 2014:

*The transaction between the Company and Supreme Well and Molecular was, according to public announcements made by the Company at the time, an arm's length transaction. However, the new documents obtained by the liquidators show that the 2 accounts into which US$355,000,000 was deposited with Bank of China Hong Kong and the Bank of East Asia respectively, had as their sole authorised signatory Mr. Tsang.*
*. . .*
*What is clear is that <u>there is good reason to be very suspicious about the genuineness of the sale of FISH and SPR</u> and that the way in which the proceeds of sale were dealt with subsequently require investigation.*
*. . .*

7

*There is now reason to think that a very large part of the Company's assets has been misappropriated through a scheme operated in Hong Kong involving various persons who themselves are normally resident here [in Hong Kong] . . . and using bank accounts in Hong Kong which were operated personally by Mr. Tsang in Hong Kong.*

*. . .*

*In the present case the evidence that has come to light since July of last year makes it clear there are strong prima facie grounds for suspecting that a very significant part of the Company's assets have been misappropriated in Hong Kong using a number of Hong Kong bank accounts operated by persons in Hong Kong. It is now clear that there is a very strong connection between Hong Kong and the affairs of the Company and that the events that took place in Hong Kong are central to the liquidation both in the sense that they need to be investigated in order that liquidators can determine whether claims are available against third parties and also in order to determine whether offences have occurred.*

24. On March 20, 2017, the United States District Court for the Eastern District of New York issued an indictment against Mr. Wu and Mr. Tsang charging them, *inter alia*, with securities fraud, securities conspiracy fraud and wire fraud conspiracy.

**Status Update Of Investigations:**

**The Liquidators' Claims:**

25. On the basis of their investigations, the Liquidators have caused CMED and its wholly owned subsidiary, CMED Technologies Ltd., to commence claims against the following parties in Hong Kong in 2016 and 2017 (**"Claims"**):

(a) Mr Wu, Mr Tsang and 21 other reciptents of CMED's stolen funds for breach of directors' duties, willful default and misconduct, conspiracy, fraud and/or accessorial liability, with respect to the misappropriation of CMED's cash;

(b) Paul Weiss for breach of the tortious duties owed by Paul Weiss to CMED in connection with the conduct of the Independent Investigation;

(c) BMI for breach of contractual and tortious duties that BMI owed to CMED in connection with the valuation of the FISH Technology;

(d) BOCHK for breach of contractual and tortious duties owed to CMED and dishonest assistance in the breaches of fiduciary duties with respect to the payments of US$355.5 million to Supreme Well pursuant to the FISH and SPR Acquisitions; and

(e) BEAHK for dishonest assistance in the breaches of fiduciary duty with respect to the payments of US$181.5 million received by Supreme Well pursuant to the FISH and SPR Acquisitions.

26. All Claims are ongoing in Hong Kong.

**KPMG Hong Kong:**

27. KPMG Hong Kong was CMED's auditor from August 2005 to August 7, 2009. During this period, KPMG audited the consolidated financial statements of CMED and its subsidiaries (together "**CMED Group**"), and issued unqualified audit opinions for the fiscal years ended 31 March 2007 and 2008 (collectively "**Audit Reports**"). KPMG Hong Kong also audited the CMED Group's consolidated financial statements, but did not issue any audit opinion, for the fiscal year ended 31 March 2009 as a result of their resignation as CMED's auditor on August 7, 2009.

28. Given that the Liquidators have not been able to retrieve any meaningful books and records from CMED and their former management, they believed that KPMG Hong Kong were the key source of documents and information relevant to the Liquidators' investigations of the affairs of the CMED Group's affairs.

29. Shortly after their appointment, the Liquidators attempted to seek the voluntary assistance of KPMG Hong Kong by producing the documents concerning CMED. Following several attempts, the Liquidators managed to obtain approximately 10 boxes of documents relating

to CMED from KPMG Hong Kong. Most, if not all, of these documents were drafts and superceded documents. The documents were only a fraction of the relevant work papers generated by KPMG Hong Kong during the course of their audits.

30. KPMG asserted, *inter alia*, that almost all of its audit files, save for a small number of draft and superceded work papers and copies of documents provided to the Liquidators, had been transferred to the Beijing office of another KPMG entity known as "KPMG Huazhen", and therefore could not be produced to the Liquidators ("**Mainland Documents**").

31. In light of KPMG Hong Kong's refusal to produce its documents, the Liquidators filed an application in the High Court of First Instance of Hong Kong ("**Hong Kong Court**") against KPMG Hong Kong on February 2015, pursuant to what was then s.221 of the Hong Kong Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap.32), to compel the production ("**KPMG s221 Application**"). KPMG opposed the KPMG s221 Application.

32. On February 24, 2016, the Hong Kong Court handed down a judgment ordering, *inter alia*, KPMG Hong Kong to give the Liquidators access to the Mainland Documents ("**February 2016 Judgment**").

33. Both KPMG Hong Kong and the Liquidators subsequently applied to vary the February 2016 Judgment. KPMG Hong Kong sought, *inter alia*, to vary the February 2016 Judgment to impose conditions upon the Liquidators' access to the Mainland Documents, including conditions that the Liquidators not be permitted to take copies of the Mainland Documents and that their inspection be supervised by their staff and counsel. The Liquidators sought an order that copies of the Mainland Documents be produced to them in the Mainland of the PRC.

34. On January 12, 2017, the Hong Kong Court delivered judgment ("**January 2017 Judgment**") dismissing KPMG Hong Kong's application and ordering, *inter alia*, KPMG Hong Kong to produce the Mainland Documents to the Liquidators in China.

35. KPMG Hong Kong subsequently appealed the January 2017 Judgment on the basis, *inter alia*, that there was a real risk of KPMG Huazhen / KPMG Hong Kong being exposed to serious sanctions under PRC law. On April 12, 2017, the Hong Kong Court of Appeal delivered judgment dismissing KPMG Hong Kong's appeal ("**Court of Appeal Judgment**") and affirming the Hong Kong Court's production orders. As a result of these three judgments, KPMG Hong Kong was required to produce the Mainland Documents to the Liquidators in the Mainland of the PRC.

36. Despite these Hong Kong Courts' judgments, KPMG Hong Kong has refused and continues to refuse to produce the Mainland Documents to the Liquidators. The Liquidators have only been able to inspect the Mainland Documents at KPMG Huazhen's office in Beijing in the presence of KPMG Huazhen's staff and their external counsel since May 2016, and that the Liquidators have been prohibited from taking copies of those documents.

37. As a result of KPMG Hong Kong's continued non-compliance of the Hong Kong Courts' production orders and after leave was granted by the Hong Kong Court, the Liquidators commenced contempt proceedings against KPMG's partners in Hong Kong on November 22, 2017 ("**Contempt Proceedings**"). KPMG has subsequently issued various summonses seeking, *inter alia*, to strike out the Liquidators' contempt proceedings ("**KPMG Summonses**"). The hearing for the KPMG Summonses has been scheduled for July 25, 2018.

38. On July 4, 2017, KPMG Hong Kong also filed an application with the Hong Kong Court requiring the service of the Writs of Summonses issued by the Liquidators (on a protective

basis) ("**Protective KPMG Summonses**") on the basis, *inter alia*, that this would facilitate the Liquidators to obtain the Mainland Documents through a procedure in an arrangement between Hong Kong and Mainland Courts concerning the mutual taking of evidence ("**Mutual Arrangement**").

39. The Protective KPMG Summonses were issued solely for the purpose of preserving any potential claims against KPMG Hong Kong and avoiding the pending expiry of possible limitation periods. At the time of the issue of these protective summonses, the Liquidators had not completed their investigations of the affairs of CMED and were not in a position to determine whether there are any viable claims against KPMG Hong Kong.

40. The Mutual Arrangment was established on March 1, 2017. The Liquidators have been advised that the operation and the effectiveness of the Mutual Arrangement is uncertain. Whether the Liquidators will be able to obtain the Mainland Documents pursuant to the Mutual Arrangement is an unknown.

41. On March 23, 2018, the Hong Kong Court delivered judgment dismissing KPMG Hong Kong's application.

42. On May 21, 2018, KPMG Hong Kong applied to the Hong Kong Court for a letter of request to be issued to the proper judicial authority of Mainland China seeking orders requiring KPMG Huazhen to produce the Mainland Documents to the Liquidators in Hong Kong through the Mutual Arrangement. A hearing date for this application will be fixed.

43. The Liquidators' investigations regarding the use and whereabouts of the $355.5 million are ongoing.

## RELIEF REQUESTED

44. This Application seeks the substitution of Samantha Wood as the Foreign Representative in place and stead of the current Foreign Representative Margot MacInnis, with all powers and authority previously granted to the Foreign Representative in the Recognition Order.

45. Upon application of Margot MacInnis (the Foreign Representative) and Cosimo Borrelli in their capacities as the joint official liquidators of CMED, the Cayman Court entered an Order, dated May 10, 2018 (as filed on May 10, 2018) (the "Second Cayman Substitution Order"), (i) confirming the resignation of Margot MacInnis from her appointment as joint official liquidator and releasing her from the performance of any duties thereunder effective as of the date of the Cayman Substitution Order; and (ii) appointing Samantha Wood, of Borrelli Walsh (Cayman) Limited, with offices located at Harbour Place, Grand Cayman, Cayman Islands, as successor to Ms. MacInnis as joint official liquidator of CMED, effective from the date of the Second Cayman Substitution Order, with same powers, exerciable jointly and severally with Mr. Borrelli. A copy of the Second Cayman Substitution Order is annexed to the Declaration of Samantha Wood as Exhibit A.

46. As a result of the resignation and release of Ms. MacInnis, and appointment of Ms. Wood as successor thereto, this Application is filed to similarly substitute and name Ms. Wood as the foreign representative in this Chapter 15 proceeding.

47. Section 1518 states: "From the time of filing the petition for recognition of a foreign proceeding, the foreign representative shall file with the court promptly a notice of change of status concerning … (1) any substantial change in the status of such foreign proceeding or the status of the foreign representative's appointment."

See 11 U.S.C. §1518.

48. Section 1521(a) states, in pertinent part: "[u]pon recognition of a foreign proceeding, whether main or non-main, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including – (7) granting any additional relief that may be available to a trustee" (with certain exceptions not applicable here[2])." See 11 U.S.C. § 1521(a)(7).

49. Ms. Wood is a "foreign representative" of CMED as such term is defined in section 101(24) of the Bankruptcy Code.

50. Section 1512 states "[u]pon recognition of a foreign proceeding, the foreign representative in the recognized proceeding is entitled to participate as a party in interest in a case regarding a debtor under this title." See 11 U.S.C. §1512.

51. This Court has already recognized the foreign proceeding as set forth in the Recognition Order. Based upon the Second Cayman Substitution Order appointing Samantha Wood as the successor to Margot MacInnis as the joint official liquidator of CMED (along with Mr. Borrelli), and the resignation and release of Ms. MacInnis of all duties as joint official liquidator of CMED, it is requested that this Court substitute Ms. Wood as the foreign representative in this Chapter 15 case.

52. The substitution of Ms. Wood as the foreign representative of CMED will allow the Foreign Representative, along with the other Liquidators, to continue their investigation into this matter.

---

[2] 11 U.S.C. § 1521(a)(7) allows the court to grant "any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)."

53. Accordingly, it is respectfully requested that this Court enter an order substituting Samantha Wood as the foreign representative of the Debtor in place and stead of the current foreign representative, Margot MacInnis, with all powers and authority previously granted to the foreign representative under the Recognition Order.

**NOTICE**

54. Notice of this Application has been provided to (a) Office of the United States Trustee; and (b) all parties that have filed a notice of appearance in this Chapter 15 case. It is respectfully submitted that no other or further notice need be given.

**NO PRIOR REQUEST**

55. No previous request for the relief requested herein has been made to this or any other Court.

**CONCLUSION**

56. It is respectfully requested that this Court enter an order substituting Samantha Wood, of Borrelli Walsh (Cayman) Limited, as the foreign representative of the Debtor in place and stead of the current foreign representative, Margot MacInnis, with all powers and authority previously granted to the foreign representative under the Recognition Order, together with such other and futher relief this Court deems just and proper.

Dated: New York, New York
June 19, 2018

                    KLESTADT WINTERS JURELLER
                    SOUTHARD & STEVENS, LLP

By: */s/ John E. Jureller, Jr.*
      Tracy L. Klestadt
      John E. Jureller, Jr.
      Lauren C. Kiss
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: 212-972-3000
Facsimile: 212-972-2245

*Attorneys for the Foreign Representative*
*and proposed Successor Foreign Representative*